# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| Jonathan Dimesky, Mohamed Haridi, Michael Burke, Stephanie Frasier, and Richard Harris, | Civil Action No. 3:19–cv–1517 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| Sanofi-Aventis U.S. LLC; Sanofi US Services Inc.; Chattem, Inc.; and Boehringer Ingelheim Pharmaceuticals, Inc., | **JURY TRIAL DEMANDED** |
| | September 26, 2019 |
| Defendants. | |

TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     PARTIES ............................................................................................................ 11

        A.      Plaintiffs ................................................................................................. 11

                1.      Connecticut Plaintiffs ............................................................... 11

                        a.      Jonathan Dimesky ......................................................... 11

                        b.      Mohamed Haridi ........................................................... 11

                2.      Florida Plaintiffs ...................................................................... 12

                        a.      Michael Burke ................................................................ 12

                        b.      Stephanie Frasier .......................................................... 12

                        c.      Richard Harris ............................................................... 13

        B.      Defendants ............................................................................................. 13

                1.      Sanofi Defendants ..................................................................... 13

                2.      Boehringer ................................................................................. 14

III.    JURISDICTION AND VENUE ......................................................................... 14

IV.     FACTUAL ALLEGATIONS .............................................................................. 15

        A.      A Brief History of Zantac ..................................................................... 15

        B.      The Dangers of N-Nitrosodimethylamine (NDMA) ............................ 17

        C.      Defendants did not disclose to consumers that Zantac exposes users to high levels
                of the carcinogen NDMA, despite scientific studies alerting Defendants of this
                fact. ........................................................................................................ 19

V.      CLASS ACTION ALLEGATIONS ................................................................... 23

VI.     TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL ........... 27

        A.      Discovery-Rule Tolling ......................................................................... 27

        B.      Fraudulent-Concealment Tolling ........................................................... 27

C.    Estoppel................................................................................................ 28

VII.    CLAIMS FOR RELIEF ................................................................................ 28

CLAIMS BROUGHT BY CONNECTICUT PLAINTIFFS ON BEHALF OF THEMSELVES,
THE NATIONWIDE CLASS, AND THE CONNECTICUT CLASS ............................ 28

Count 1: Violation of Connecticut Unfair Trade Practices Act  (Conn. Gen. Stat. §§ 42-
110a to -110q), Claim by Connecticut Plaintiffs Against All Defendants................ 28

Count 2: Fraudulent Concealment (Under Connecticut Common Law), Claim by
Connecticut Plaintiffs Against All Defendants ........................................ 31

CLAIMS BROUGHT BY FLORIDA PLAINTIFFS ON BEHALF OF  THEMSELVES AND THE
FLORIDA CLASS............................................................................................ 33

Count 3: Violation of Florida Deceptive and Unfair  Practices Act (Fla. Stat. §§ 501.201–
.213), Claim by Florida Plaintiffs Against Boehringer ................................ 33

Count 4: Fraudulent Concealment (Under Florida Common Law), Claim by Florida
Plaintiffs Against Boehringer ........................................................... 35

VIII.    PRAYER FOR RELIEF ................................................................................ 37

IX.    JURY DEMAND ...................................................................................... 38

Plaintiffs, on behalf of themselves and all others similarly situated, in their action against Defendants Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., and Chattem, Inc. (collectively "Sanofi" or "Sanofi Defendants"), and Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer") allege the following based on personal knowledge, the investigation of counsel, and information and belief.

## I.    INTRODUCTION

1.      Zantac—the brand-name version of the generic drug ranitidine—is used to treat gastrointestinal conditions such as acid indigestion, heartburn, sour stomach, and gastroesophageal reflux disease.[1] Zantac was first sold in the United States in 1983; three years later, it became the first drug to total $1 billion in sales.[2]

2.      As recently as 2018, Zantac was widely used and remained one of the most popular tablet brands of antacid[3] in the United States, with sales of Zantac 150 (the over-the-counter tablets containing a 150 mg dose) totaling $128.9 million annually.[4] Over-the-counter Zantac also is sold in the form of tablets containing a 75 mg dose (Zantac 75).

---

[1] *Ranitidine hydrochloride – Drug Summary*, PRESCRIBER'S DIGITAL REFERENCE (last visited Sept. 24, 2019), https://www.pdr.net/drug-summary/Zantac-150-and-300-Tablets-ranitidine-hydrochloride-241.3325.

[2] Richard Wright, M.D., *How Zantac Became the Best-Selling Drug in History*, 16(4) J. HEALTHCARE MARKETING 24 (Winter 1996).

[3] Zantac is not technically an antacid because it "works by reducing the amount of acid [the] stomach makes," whereas antacids "neutralize the acid that your stomach has already made." *See Ranitidine, Oral Tablet*, HEALTHLINE (last visited Sept. 24, 2019), https://www.healthline.com/health/ranitidine-oral-tablet. Nonetheless, this Complaint sometimes refers to Zantac as an antacid because this is often how the drug is referred to colloquially. *See, e.g., Leading antacid tablet brands in the United States in 2018, based on sales*, STATISTA (last visited Sept. 24, 2019), https://www.statista.com/statistics/194544/leading-us-antacid-tablet-brands-in-2013-based-on-sales/.

[4] *Leading antacid tablet brands in the United States in 2018*, *supra* footnote 3.

3.     But Zantac's unprecedented sales were possible only because of a deception perpetrated by the drug's manufacturers on consumers who have purchased Zantac since it hit the market in 1983. Sanofi and Boehringer are only the most recent perpetrators of this deception.

4.     Sanofi has owned the U.S. rights to over-the-counter Zantac since about January 2017, and has manufactured and distributed the drug during that period. Previously, Defendant Boehringer owned the U.S. rights to over-the-counter Zantac and manufactured and distributed the drug from about October 2006 to January 2017.

5.     But neither Sanofi nor Boehringer ever disclosed to consumers that the drug has a critical defect: When ingested, Zantac produces in the human body high quantities of N-Nitrosodimethylamine (NDMA), a chemical that the World Health Organization has described as "clearly carcinogenic."[5] The dangers of NDMA have been publicly known for over 40 years.[6] NDMA itself belongs to a family of chemicals called N-nitrosamines, which the U.S. Environmental Protection Agency refers to as "potent carcinogens."

6.     Recent scientific testing conducted by Valisure LLC and ValisureRX LLC (collectively "Valisure") "has detected extremely high levels of NDMA in *all lots [of ranitidine] tested,* across multiple manufacturers of ranitidine products," including Zantac.[7]

---

[5] R.G. Liteplo, et al., *Concise International Chemical Assessment Document 38: N-Nitrosodimethylamine,* WORLD HEALTH ORGANIZATION (2002), *available at* https://www.who.int/ipcs/publications/cicad/en/cicad38.pdf.

[6] *See, e.g.,* Jane Brody, *Bottoms Up: Alcohol in moderation can extend life,* THE GLOBE AND MAIL (CANADA) (Oct. 11, 1979) ("As one of a family of carcinogens called nitrosamines, NDMA has caused cancer in nearly every laboratory animal tested so far.").

[7] Valisure Citizen Petition to FDA ("Citizen Petition") at 6 (emphasis added), *available at* https://hbw.pharmaintelligence.informa.com/~/media/Supporting%20Documents/Rose%20Sheet/2019/09/9%20Sept%202019%20Valisure%20Ranitidine%20Petition.pdf.

7.    Valisure has notified the FDA of its findings by filing a citizen petition on September 13, 2019.[8]

8.    Valisure is an "online pharmacy currently licensed in 38 states and an analytical laboratory that is ISO 17025 accredited by the International Organization for Standardization."[9] Valisure also is registered with the Drug Enforcement Administration and the FDA.[10] The tests conducted by Valisure show that "ranitidine can react with itself in standard analysis conditions . . . at high efficiency to produce NDMA at dangerous levels well in excess of the permissible daily intake limit for this probable carcinogen."[11]

9.    The FDA recently announced a permissible intake limit of **96 ng** of NDMA per day.[12] But even this limit may be too high: A public health statement issued 30 years ago by the Agency for Toxic Substances and Disease Registry warned of the dangers posed by NDMA, noting among other things that "high level short-term and *low level long-term exposures* [to NDMA] caused non-cancerous liver damage and/or cancer in animals [and] also usually resulted in internal bleeding and death."[13]

---

[8] *Id.*

[9] *Id.* at 2.

[10] *Id.*

[11] *Id.*

[12] *FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan)*, FDA (last updated Aug. 28, 2019) (setting "interim limits for NDMA" and other nitrosamines at 96 ng/day for angiotensin II receptor blockers).

[13] Agency for Toxic Substances & Disease Registry, *Public Health Statement for n-Nitrosodimethylamine* 2 (Dec. 1989) (emphasis added), available at https://www.atsdr.cdc.gov/ToxProfiles/tp141-c1-b.pdf. The public health statement also notes that "[s]hort-term or long-term exposure of animals to water or food containing NDMA is also associated with serious effects, such as liver disease and death, at levels ranging from 5 to 50 ppm [parts per million] in water and 5 to 100 ppm in food." *Id.* at 3.

10.    Valisure's testing—which employs the FDA's own gas chromatography/mass spectrometry ("GC/MS") protocol—detects **2,511,469 ng** of NDMA per 150 mg tablet of Zantac.[14] In other words, the FDA protocol detects a quantity of NDMA in each Zantac tablet that is more than __26,000 times__ greater than the FDA's daily permissible intake levels.

11.    "The typical recommended dose of ranitidine for therapy of peptic ulcer disease in adults is 150 mg twice daily or 300 mg once nightly for 4 to 8 weeks, and maintenance doses of 150 mg once daily."[15] Moreover, chronic use of the drug is common "for therapy of heartburn and indigestion."[16]

12.    Thus, a typical consumer who is taking Zantac over the course of eight weeks to treat peptic ulcer disease is exposed to more than 280,000,000 ng (or 0.28 grams) of NDMA. And a consumer who takes a 150 mg maintenance dose of Zantac once daily is exposed to 889,000,000 ng (0.889 grams) of NDMA over the course of a year. Again, the FDA's permissible intake limit of NDMA is 96 ng per day, which translates to just 0.000034 grams per year for consumers who take a 150 mg maintenance dose daily.

13.    Zantac is used not only by adults but is also given to children and teenagers to treat gastroesophageal reflux, among other things.[17]

---

[14] Citizen Petition, *supra* footnote 7, at 6.

[15] *Drug Record: Ranitidine*, NATIONAL INSTITUTES OF HEALTH (updated July 1, 2019), https://livertox.nih.gov/Ranitidine.htm.

[16] *Id.*

[17] *Treatment for GER & GERD in Children & Teens*, NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES (Apr. 2015), https://www.niddk.nih.gov/health-information/digestive-diseases/acid-reflux-ger-gerd-children-teens/treatment.

14.    In addition to the GC/MS testing described above, when Valisure tested Zantac "in conditions simulating the human stomach," the quantity of NDMA detected was as high as 304,500 ng per tablet—**3,171 times** more than the amount that can be safely ingested daily.[18] This is consistent with recent peer-reviewed scientific literature, which has demonstrated the existence of dangerous levels of NDMA in the urine of those who have taken ranitidine.[19]

15.    When the news broke on September 13, 2019 that Zantac exposed users to NDMA, "[g]lobal health regulators sounded a coordinated alarm."[20]

16.    Some countries' regulators have taken steps to protect the public from exposure to ranitidine. At the request of Health Canada, the department of the Canadian government responsible for national public health, "companies marketing ranitidine products in Canada have stopped any further distribution until evidence is provided to demonstrate that they do not contain NDMA above acceptable levels."[21]

---

[18] Citizen Petition, *supra* footnote 7, at 6–7.

[19] Teng Zeng & William A. Mitch, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37(6) CARCINOGENESIS 625 (Mar. 18, 2016).

[20] Anna Edney & John Lauerman, *Carcinogen in Zantac and its generics triggers probes by FDA, EU*, THE HAMILTON SPECTATOR (Sept. 13, 2019), https://www.thespec.com/news-story/9595764-carcinogen-in-zantac-and-its-generics-triggers-probes-by-fda-eu/.

[21] *Information Update – Health Canada requests that companies stop distributing ranitidine drugs in Canada while it assesses NDMA; some products being recalled*, CISION CANADA (Sept. 17, 2019), https://www.newswire.ca/news-releases/information-update-health-canada-requests-that-companies-stop-distributing-ranitidine-drugs-in-canada-while-it-assesses-ndma-some-products-being-recalled-821911993.html.

17.     Germany, Switzerland, and Austria all have initiated recalls of ranitidine-based drugs,[22] and Finland has withdrawn drugs containing ranitidine from its pharmacies.[23] The Italian Drug Agency also has recalled certain ranitidine-based drugs.[24]

18.     Singapore has suspended the sale and supply of several brands of ranitidine.[25] Qatar's Ministry of Public Health "has withdrawn samples of ranitidine, including the one commercially known as Zantac, from public and private pharmacies" and has "recommend[ed] patients who use these drugs to review and consult their doctor, and those who use them without a prescription should use other alternatives."[26]

19.     Pakistan's Drug Regulatory Authority "has ordered all the pharmaceutical companies to stop manufacturing medicines using 'Ranitidine' and to recall all such products in

---

[22] Tom Gallen, *Ranitidine Recalls Begin In Europe As Regulators Take Action*, PHARMA INTELLIGENCE (Sept. 18, 2019), https://hbw.pharmaintelligence.informa.com/RS149219/Ranitidine-Recalls-Begin-In-Europe-As-Regulators-Take-Action.

[23] *Pharmacies pull heartburn meds over contamination concerns*, UUTISET (Sept. 19, 2019), https://yle.fi/uutiset/osasto/news/pharmacies_pull_heartburn_meds_over_contamination_concerns/10977530.

[24] PB Jayakumar, *Anti-acidity drug ranitidine gives heartburn to industry and public*, BUSINESS TODAY (Sept. 24, 2019), https://www.businesstoday.in/sectors/pharma/anti-acidity-drug-ranitidine-gives-heartburn-to-industry-and-public/story/380916.html.

[25] *Singapore halts sales of some antacids over stomach cancer concerns*, SOUTH CHINA MORNING POST (Sept. 16, 2019), https://www.scmp.com/news/asia/southeast-asia/article/3027521/singapore-halts-sales-some-antacids-over-stomach-cancer.

[26] *Health ministry recalls Zantac as a precautionary measure*, QATAR TRIBUNE (Sept. 16, 2019), http://www.qatar-tribune.com/news-details/id/172460.

the market."[27] And the United Arab Emirates "has temporarily suspended the distribution of medicine containing ranitidine due to possible contamination."[28]

20.     Significantly, some countries' regulators also have acknowledged that, as Valisure's citizen petition states, the high levels of NDMA detected in brand-name and generic versions of Zantac are not due to a manufacturing defect but rather result from the molecular structure of ranitidine, Zantac's active ingredient. According to Canadian regulators, "[c]urrent evidence suggests that NDMA may be present in ranitidine, regardless of the manufacturer."[29] Similarly, South Korea's Ministry of Food and Drug Safety has stated that "[i]t suspects NDMA may have been unintentionally produced *in the course of natural decomposition and synthesis reactions of the nitrite and dimethylamine chemicals in ranitidine* or by dimethylamine accidentally being added during the manufacturing process."[30]

21.     Some companies that manufacture and distribute generic Zantac also have taken action to protect consumers. Sandoz, a unit of Novartis AG, has stopped its "worldwide

---

[27] Rava Rizvi, *DRAP Orders Recall of Medicine That Can Cause Cancer*, PROPAKISTANI (Sept. 24, 2019), https://propakistani.pk/2019/09/24/drap-orders-recall-of-medicine-that-can-cause-cancer/?utm_source=rss&utm_medium=rss&utm_campaign=drap-orders-recall-of-medicine-that-can-cause-cancer.

[28] *UAE suspends medicine with ranitidine*, EXPAT MEDIA (Sept. 24, 2019), https://www.expatmedia.net/uae-suspends-medicine-ranitidine/2019/09/.

[29] *Information Update*, *supra* footnote 21.

[30] *Korea bans sales of Zantac and other ranitidine drugs after carcinogen alert*, PULSE (Sept. 26, 2019), https://m.pulsenews.co.kr/view.php?year=2019&no=769561.

distribution of generic versions" of Zantac.[31] And Dr. Reddy's Laboratories Limited has suspended its supply of generic Zantac (ranitidine) worldwide.[32]

22.    Unfortunately, the FDA has done very little to protect the American public with respect to Zantac. Valisure first alerted the FDA of "the inherent instability and danger of all ranitidine products in June of 2019."[33] But the FDA did not notify the public until September 13, 2019, when the agency issued a statement acknowledging that Zantac contains NDMA but, in a seeming attempt to downplay the issue, claimed that the amount of NDMA detected was low: "The U.S. Food and Drug Administration has learned that some ranitidine medicines, including some products commonly known as the brand-name drug Zantac, contain a nitrosamine impurity called N-nitrosodimethylamine (NDMA) at low levels."[34] The FDA has further confused the public by referring to the presence of NDMA as an "impurity" in Zantac as opposed to what is alleged here and in the Citizen's Petition: that the formation of NDMA is the result of the chemical structure of ranitidine, not an impurity. Further, although numerous regulators outside of the United States have cautioned those taking Zantac to consider taking an alternative

---

[31] Anna Edney, *Carcinogen Scare Sets Off Global Race to Contain Tainted Zantac*, BLOOMBERG (Sept. 18, 2019), https://www.bloomberg.com/news/articles/2019-09-18/sandoz-halts-distribution-of-zantac-after-carcinogen-concerns.

[32] *Dr Reddy tumbles on buzz of halting worldwide supply of Ranitidine*, BUSINESS STANDARD (Sept. 23, 2019), https://www.business-standard.com/article/news-cm/dr-reddy-tumbles-on-buzz-of-halting-worldwide-supply-of-ranitidine-119092300347_1.html.

[33] Eric Palmer, *Novartis is first to recall generic Zantac after confirming suspected carcinogen*, FIERCE PHARMA (Sept. 24, 2019), https://www.fiercepharma.com/manufacturing/novartis-first-to-recall-generic-zantac-after-confirming-suspected-carcinogen.

[34]    FDA, *Statement alerting patients and health care professionals of NDMA found in samples of Ranitidine* (Sept. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine.

medication given the availability of many safe alternative medicines, the FDA informed the American public that it need not discontinue taking over-the-counter Zantac.[35]

23.    On September 24, 2019, the FDA announced through a news release that Sandoz Inc. had voluntarily recalled 14 lots of prescription ranitidine capsules because of a "nitrosamine impurity" found in the drug.[36] In the news release, the FDA stated that "[c]onsumers taking OTC ranitidine could consider using other OTC products for their condition."[37] Unfortunately, the news release continues to sow confusion among consumers, as the FDA also stated: "[C]onsumers and patients can continue to take ranitidine that has not been recalled. It is important to remember that not all ranitidine marketed in the U.S. is being recalled."[38]

24.    Like the FDA, Sanofi—which currently manufactures and distributes over-the-counter Zantac in the United States—has taken no steps to protect the American public. Sanofi has announced that it "isn't halting distribution of the drug or any of its other ranitidine products outside of Canada."[39]

25.    Both Sanofi and Boehringer knew or had reason to know that Zantac exposes users to unsafe levels of the carcinogen NDMA: During the period that Sanofi and Boehringer

---

[35] *FDA to review ranitidine after detecting cancer-causing contamination*, PHARMACEUTICAL TECHNOLOGY (Sept. 16, 2019), https://www.pharmaceutical-technology.com/news/fda-ranitidine-review/.

[36] FDA, *FDA announces voluntary recall of Sandoz ranitidine capsules following detection of an impurity* (Sept. 24, 2019), https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-sandoz-ranitidine-capsules-following-detection-impurity.

[37] *Id.*

[38] *Id.*

[39] Anna Edney, *Carcinogen scare sets off global race to contain tainted Zantac*, LOS ANGELES TIMES (Sept. 18, 2019), https://www.latimes.com/business/story/2019-09-18/carcinogen-scare-tainted-zantac.

manufactured and distributed Zantac, numerous scientific studies were published showing, among other things, that ranitidine (the generic bioequivalent of Zantac) forms NDMA when placed in drinking water[40] and that a person who consumes ranitidine has a 400-fold increase of NDMA concentration in their urine.[41]

26.    Despite the weight of scientific evidence showing that Zantac exposed users to unsafe levels of the carcinogen NDMA, neither Sanofi nor Boehringer ever disclosed this risk to consumers on the drug's label—or through any other means. Had Defendants disclosed that Zantac results in unsafe levels of NDMA in the human body, no person, let alone a reasonable person, would have purchased and consumed Zantac.

27.    Plaintiffs are persons who have previously purchased the over-the-counter version of the branded drug Zantac in either Connecticut or Florida between January 1, 2010 and the present (the "relevant period" or the "Class Period").

28.    Had Plaintiffs and Class members known that taking Zantac would expose them to high levels of the carcinogen NDMA, they would not have purchased the drug.

---

[40] *See, e.g.*, Massimiliano Sgroi, et al., *N-Nitrosodimethylamine (NDMA) and its precursors in water and wastewater: A review of formation and removal*, 191 CHEMOSPHERE 685 (Oct. 15, 2017); Yong Dong Liu, et al., *Formation Mechanism of NDMA from Ranitidine, Trimethylamine, and Other Tertiary Amines during Chloramination: A Computational Study*, 48 ENVTL. SCI. & TECHNOLOGY 8653 (June 26, 2014); Julien Le Roux, et al., *Chloramination of nitrogenous contaminants (pharmaceuticals and pesticides): NDMA and halogenated DBPs formation*, 45 WATER RESEARCH 3164 (Mar. 26, 2011); Ruqiao Shen & Susan A. Andrews, *Demonstration of 20 pharmaceuticals and personal care products (PPCPs) as nitrosamine precursors during chloramine disinfection*, 45 WATER RESEARCH 944 (Oct. 13, 2010); Giovanni Brambilla & Antonietta Martelli, *Update on genotoxicity and carcinogenicity testing of 472 marketed pharmaceuticals*, 681 MUTATION RESEARCH 209 (Sept. 19, 2008); Giovanni Brambilla & Antonietta Martelli, *Genotoxic and carcinogenic risk to humans of drug–nitrite interaction products*, 635 MUTATION RESEARCH 17 (Dec. 6, 2006).

[41] Zeng & Mitch, *supra* footnote 19.

29.     Defendants' failure to disclose this material information to Plaintiffs and Class members violates the laws of Connecticut and Florida.

## II.     PARTIES

### A. Plaintiffs

#### 1. Connecticut Plaintiffs

##### a. Jonathan Dimesky

30.     Plaintiff Jonathan Dimesky is a citizen of Connecticut and resides in Cheshire, Connecticut.

31.     Mr. Dimesky first purchased over-the-counter Zantac in about 2013 and until recently took the drug multiple times a week.

32.     Mr. Dimesky purchased Zantac in the form of 150 mg tablets at CVS, Walgreens, Walmart, and other stores in Connecticut.

33.     Mr. Dimesky spent approximately $500 on Zantac during the relevant period.

34.     If Mr. Dimesky had known that taking Zantac would expose him to unsafe quantities of NDMA, he would not have purchased or used the drug.

##### b. Mohamed Haridi

35.     Plaintiff Mohamed Haridi is a citizen of Connecticut and resides in Vernon, Connecticut.

36.     Mr. Haridi has been a citizen of Connecticut since 2015; before that, he was a citizen of New York.

37.     Mr. Haridi purchased and used over-the-counter Zantac from about 2012 through early 2018. He stopped taking the medication for a time, and then took it again for a period of three months.

38.     Mr. Haridi purchased and used Zantac in the form of 150 mg tablets. Since moving to Connecticut in 2015, he has purchased the drug at Walmart stores in Connecticut.

39.     Mr. Haridi spent approximately $850 on Zantac during the relevant period

40.     If Mr. Haridi had known that taking Zantac would expose him to unsafe quantities of NDMA, he would not have purchased or used the drug.

**2.  Florida Plaintiffs**

**a.  Michael Burke**

41.     Plaintiff Michael Burke is a citizen of Florida and resides in Longwood, Florida.

42.     Mr. Burke first purchased over-the-counter Zantac in about 2013 or 2014 and has until recently taken the medication to treat his acid reflux.

43.     During the five or six years that he has taken Zantac, Mr. Burke has generally purchased Zantac in the form of 150 mg tablets and has taken such tablets one to three times a day.

44.     All of Mr. Burke's purchases of Zantac have occurred in Florida, and he has generally purchased the drug at 7-Eleven or CVS stores.

45.     Mr. Burke spent approximately $750 on Zantac during the relevant period.

46.     If Mr. Burke had known that taking Zantac would expose him to unsafe quantities of NDMA, he would not have purchased or used the drug.

**b.  Stephanie Frasier**

47.     Plaintiff Stephanie Frasier is a citizen of Florida and resides in Fort Pierce, Florida.

48.     Ms. Frasier first purchased over-the-counter Zantac in 2013 and has generally taken the drug two times a day since to treat her acid reflux, except for a brief period when she took the drug three times a day to treat enteritis.

49.     Ms. Frasier purchased Zantac in packages of either 75 mg or 150 mg tablets.

50.     Ms. Frasier has purchased Zantac mostly at Walmart stores in Florida but recently has purchased Zantac on Amazon as well.

51.     Ms. Frasier spent approximately $400 on Zantac during the relevant period.

52.     If Ms. Frasier had known that taking Zantac would expose her to unsafe quantities of NDMA, she would not have purchased or used the drug.

**c.  Richard Harris**

53.     Richard Harris is a citizen of Florida and resides in Daytona Beach, Florida.

54.     Mr. Harris began taking over-the-counter Zantac in 2016 and has taken the drug twice a day since that time to treat stomach issues.

55.     Mr. Harris generally purchased packages of the 75 mg tablets of Zantac but may also have purchased different doses.

56.     He typically purchased Zantac at Family Dollar.

57.     Mr. Harris spent approximately $400 on Zantac during the relevant period.

58.     If Mr. Harris had known that taking Zantac would expose him to unsafe quantities of NDMA, he would not have purchased or used the drug.

**B.  Defendants**

**1.  Sanofi Defendants**

59.     Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807, and is a wholly owned subsidiary of the French company Sanofi.

60.    Defendant Sanofi US Services Inc. is a Delaware corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807, and is a wholly owned subsidiary of the French company Sanofi.

61.    Defendant Chattem, Inc. is a Tennessee corporation with a principal place of business at 1715 West 38th Street Chattanooga, Tennessee 37409, and is a wholly owned subsidiary of the French company Sanofi.

62.    Defendants Sanofi-Aventis U.S. LLC; Sanofi US Services Inc.; and Chattem, Inc. (collectively "Sanofi" or "Sanofi Defendants") controlled the U.S. rights to over-the-counter Zantac from about January 2017 to the present, and manufactured and distributed the drug in the United States during that period.

**2.  Boehringer**

63.    Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer") is a Delaware corporation with a principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut 06877, and is a subsidiary of the German company Boehringer Ingelheim Corporation. Boehringer owned the U.S. rights to over-the-counter Zantac from about October 2006 to January 2017, and manufactured and distributed the drug in the United States during that period.

### III.    JURISDICTION AND VENUE

64.    This Court has jurisdiction under 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over any civil action in which the matter in controversy exceeds the sum or value of $5 million, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

65.     The Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in this district. Defendants' unlawful conduct has injured persons residing in, located in, or doing business throughout this District.

66.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) each Defendant transacts business in, is found in, and/or has agents in this district, and because a substantial part of the events giving rise to this action occurred within this district.

## IV.    FACTUAL ALLEGATIONS

### A.  A Brief History of Zantac

67.     Zantac was developed by Glaxo—now GlaxoSmithKline—and approved for prescription use by the FDA in 1983.[42] The drug belongs to a class of medications called histamine H2-receptor antagonists (or H2 blockers), which decrease the amount of acid produced by the stomach and are used to treat gastric ulcers, heartburn, acid indigestion, sour stomach, and other gastrointestinal conditions.[43]

68.     Due in large part to Glaxo's marketing strategy, Zantac was a wildly successful drug, reaching $1 billion in total sales in December 1986.[44] As one 1996 article put it, Zantac became "the best-selling drug in history as a result of a shrewd, multifaceted marketing strategy

---

[42] Wright, *supra* footnote 2, at 26.

[43] *Histamine H2 Antagonist (Oral Route, Injection Route, Intravenous Route)*, MAYO CLINIC (last updated Aug. 1, 2019), https://www.mayoclinic.org/drugs-supplements/histamine-h2-antagonist-oral-route-injection-route-intravenous-route/description/drg-20068584.

[44] *See* Wright, *supra* footnote 2, at 27.

that . . . enabled the product to dominate the acid/peptic marketplace."[45] Significantly, the

marketing strategy that led to Zantac's success emphasized the purported safety of the drug.[46]

69.    Zantac became available without a prescription in 1996,[47] and generic versions of

the drug (ranitidine) became available the following year.[48] Although sales of brand-name Zantac

declined "as a result of generic and alternative products,"[49] Zantac sales have remained strong over

time. As recently as 2018, Zantac was one of the top 10 antacid tablet brands in the United States,

with sales of Zantac 150 totaling $128.9 million[50]—a 3.1% increase from the previous year.[51]

70.    Over the past 20 years, the rights to Zantac in the U.S. have changed hands several

times.

71.    As relevant here, Defendant Boehringer acquired the U.S. rights to

over-the-counter Zantac in late 2006,[52] and manufactured and sold the drug in the United States

from approximately January 2007 to January 2017.[53]

---

[45] *See* Wright, *supra* footnote 2, at 25

[46] *See* Wright, *supra* footnote 2, at 27.

[47] Wright, *supra* footnote 2, at 28.

[48] David Ranii, *Generic Zantac on market*, NEWS AND OBSERVER (Aug. 5, 1997).

[49] *GlaxoSmithKline – Product Portfolio*, PHARMACEUTICALS COMPANY ANALYSIS (Jan. 21, 2003) (Lexis Advance).

[50] *Leading antacid tablet brands in the United States in 2018*, *supra* footnote 3.

[51] *Sales growth of leading brands of antacid tablets in the United States in 2018 (change to prior sales year)*, STATISTA (last visited Sept. 13, 2019), https://www.statista.com/statistics/194547/us-sales-growth-of-antacid-tablet-brands-in-2013/.

[52] *Boehringer Ingelheim Pharmaceuticals, Inc. Announces Agreement to Acquire Zantac® from Johnson & Johnson and the Pfizer Consumer Healthcare Business*, BUSINESS WIRE (Oct. 12, 2006).

[53] *See Digesting an acquisition: Patrick Hennig, Boehringer Ingelheim; Ingelheim Pharmaceuticals to acquire U.S. rights for Zantac product line; Interview*, DRUG STORE NEWS (Mar. 5, 2007); Mike Pare,

72.    The Sanofi Defendants acquired the U.S. rights to over-the-counter Zantac in approximately January 2017 and have since that time been manufacturing and selling the drug in the United States.[54]

**B.  The Dangers of N-Nitrosodimethylamine (NDMA)**

73.    "NDMA is a semivolatile organic chemical that forms in both industrial and natural processes. It is a member of N-nitrosamines, a family of potent carcinogens."[55]

74.    The dangers that NDMA poses to human health have long been recognized. A news article published in 1979 noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."[56] NDMA is no longer produced or commercially used in the United States, except for research.[57] In other words, it is only a poison.

---

*Chattem adds Zantac, Dulcolax to portfolio*, CHATTANOOGA TIMES FREE PRESS (TENNESSEE) (Feb. 8, 2017).

[54] *Chattem adds Zantac*, *supra* footnote 53.

[55] *Technical Fact Sheet – N-Nitroso-dimethylamine (NDMA)*, ENVIRONMENTAL PROTECTION AGENCY (Jan. 2014), https://www.epa.gov/sites/production/files/2014-03/documents/ffrrofactsheet_contaminant_ndma_january2014_final.pdf.

[56] Jane Brody, *Bottoms Up: Alcohol in moderation can extend life*, THE GLOBE AND MAIL (CANADA) (Oct. 11, 1979); *see* Rudy Platiel, *Anger grows as officials unable to trace poison in reserve's water*, THE GLOBE AND MAIL (CANADA) (Jan. 6, 1990) (reporting that residents of Six Nations Indian Reserve "have been advised not to drink, cook or wash in the water because testing has found high levels of N-nitrosodimethylamine (NDMA), an industrial byproduct chemical that has been linked to cancer"); S.A. Kyrtopoulos, *DNA adducts in humans after exposure to methylating agents*, 405 MUTATION RESEARCH 135 (1998) (noting that "chronic exposure of rats to very low doses of NDMA gives rise predominantly to liver tumours, including tumours of the liver cells (hepatocellular carcinomas), bile ducts, blood vessels and Kupffer cells").

[57] *Technical Fact Sheet*, *supra* footnote 55.

75.    Both the EPA and the International Agency for Research on Cancer have classified NDMA as a probable human carcinogen.[58] And the World Health Organization has stated that scientific testing indicates that "NDMA consumption is positively associated with either gastric or colorectal cancer" and "suggests that humans may be especially sensitive to the carcinogenicity of NDMA."[59]

76.    As early as 1980, consumer products containing unsafe levels of NDMA and other nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of the FDA.[60]

77.    Most recently, beginning in the summer of 2018, there have been recalls of several generic drugs used to treat high blood pressure and heart failure—valsartan, losartan, and irbesartan—because the medications "contain[ed] nitrosamine impurities that don't meet the [FDA's] safety standards,"[61] which provide that the intake of NDMA should be no more than 96 ng.[62] The highest level of NDMA detected by the FDA in any of the valsartan tablets was 20.19 μg (or 20,190 ng) per tablet.[63] In the case of valsartan, the NDMA was an impurity caused

---

[58] *Technical Fact Sheet*, *supra* footnote 55; World Health Organization, *N-Nitrosodimethylamine (NDMA)*, GUIDELINES FOR DRINKING-WATER QUALITY (3rd ed. 2008) [hereinafter *WHO Guidelines*], *available at* https://www.who.int/water_sanitation_health/dwq/chemicals/ ndmasummary_2ndadd.pdf.

[59] *WHO Guidelines*, *supra* footnote 58.

[60] *See, e.g.,* Karen De Witt, *Carcinogen Fear Allayed*, THE NEW YORK TIMES (July 2, 1980) (reporting recall of beer that contained higher level of nitrosamines than that permitted by FDA).

[61] *Recalls of Angiotensin II Receptor Blockers (ARBs) including Valsartan, Losartan and Irbesartan*, FDA (May 23, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/recalls-angiotensin-ii-receptor-blockers-arbs-including-valsartan-losartan-and-irbesartan.

[62] *FDA Updates and Press Announcements*, *supra* footnote 12.

[63] *See Laboratory analysis of valsartan products*, FDA (May 2, 2019), https://www.fda.gov/ drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products.

by a manufacturing defect, and thus NDMA was present in only *some* valsartan products.

78.     Zantac poses a greater safety risk than any of the recently recalled valsartan tablets. Applying the FDA-recommended GC/MS protocols for detecting NDMA—the same protocols used by the FDA to detect NDMA in valsartan[64]—the level of NDMA in Zantac is 2,511,469 ng per Zantac tablet—**124 times** more than the highest amount detected in the recalled valsartan.[65]

79.     Moreover, the high levels of NDMA produced by Zantac are not caused by a manufacturing defect but rather are inherent to the molecular structure of ranitidine, the active ingredient in Zantac: "The ranitidine molecule contains both a nitrite and a dimethylamine ('DMA') group which are well known to combine to form NDMA."[66] Thus, ranitidine produces NDMA by "react[ing] with itself,"[67] which means that *every dosage and form of ranitidine*, including Zantac, exposes users to NDMA.[68]

**C. Defendants did not disclose to consumers that Zantac exposes users to high levels of the carcinogen NDMA, despite scientific studies alerting Defendants of this fact.**

80.     During the time that Defendants manufactured and sold over-the-counter Zantac in the United States, the weight of scientific evidence showed that Zantac exposed users to unsafe levels of NDMA. Neither Sanofi nor Boehringer ever disclosed this risk to consumers on the drug's label—or through any other means—nor did Defendants report these risks to the FDA.

---

[64] *Combined N-Nitrosodimethylamine (NDMA) and N-Nitrosodiethylamine (NDEA)Impurity Assayby GC/MS-Headspace*, FOOD & DRUG ADMINISTRATION (Jan. 25, 2019), https://www.fda.gov/media/117843/download.

[65] *See* Citizen Petition, *supra* footnote 7, at 5; *Combined N-Nitrosodimethylamine*, *supra* footnote 64.

[66] Citizen Petition, *supra* footnote 7, at 19.

[67] Citizen Petition, *supra* footnote 7, at 2.

[68] Citizen Petition, *supra* footnote 7, at 1.

81.    For example, a 2011 scientific study found that, out of eight pharmaceuticals that were observed, "ranitidine showed the strongest potential to form N-nitrosodimethylamine (NDMA)" when present in drinking water during chloramine disinfection.[69] The same study noted that "[r]anitidine gave a much higher yield of NDMA in the present study than reported in [prior] literature."[70] Another 2011 scientific article that examined ranitidine in the water supply also found that the drug was "an important NDMA precursor."[71]

82.    A 2014 scientific article that examined the formation mechanisms of NDMA acknowledged the consensus about the dangers posed by ranitidine, observing that ranitidine and two other pharmaceuticals had "recently caused much concern because they are potent NDMA precursors."[72]

83.    A peer-reviewed study published in the scientific journal *Carcinogenesis* in 2016 "confirmed the production of N-nitrosodimethylamine (NDMA), a potent carcinogen, by nitrosation of ranitidine under stomach-relevant pH conditions *in vitro*" and also showed that, during the 24 hours following ranitidine intake, the quantity of NDMA in urine excreted by the patient "increased 400-folds from 110 to 47 600 ng."[73] The article noted that these levels of

---

[69] Shen & Andrews, *supra* footnote 40, at 944. "Chloramination is the process of adding chloramine to drinking water to disinfect it and kill germs. Chloramination is sometimes used as an alternative to chlorination." *Disinfection with Chloramine*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Jan. 20, 2015), https://www.cdc.gov/healthywater/drinking/public/chloramine-disinfection.html.

[70] Shen & Andrews, *supra* footnote 40, at 948.

[71] Le Roux, *supra* footnote 40, at 3165.

[72] Liu, *supra* footnote 40, at 8660.

[73] Zeng & Mitch, *supra* footnote 19, at 625. William Mitch is a professor of Civil and Environmental Engineering at Stanford University. *William Mitch*, Stanford University, https://cee.stanford.edu/people/william-mitch (last visited Sept. 19, 2019). Teng Zeng is an

NDMA "equaled or exceeded those observed previously in patients with schistosomiasis, a disease wherein N-nitrosamines are implicated as the etiological agents for bladder cancer."[74] The article also cautioned that these "estimates are conservative": The actual exposure to NDMA is "likely much higher than that eliminated in urine" since NDMA has "a high metabolic conversion rate" so that only about 0.05% of NDMA in the body is excreted in urine.[75] The authors of the study concluded that "a more comprehensive risk assessment"—such as "[e]pidemiological studies evaluating cancer risk, particularly bladder cancer, attributable to the long-term use of ranitidine"—was needed because of "the widespread use of ranitidine."[76] The authors also noted that "alternative medications, such as proton pump inhibitors (PPIs), would less likely promote *in vivo* nitrosation because of the lack of amines in their structure."[77]

84.     A 2018 scientific review "summariz[ing] major findings over the last decade related to N-Nitrosodimethylamine (NDMA)"[78] again pointed out that ranitidine had a high rate of NDMA formation "upon chloramination."[79]

---

Associate Professor of Civil and Environmental Engineering at Syracuse University. *Teng Zeng*, Syracuse University College of Engineering & Computer Science, http://eng-cs.syr.edu/our-departments/civil-and-environmental-engineering/people/faculty/?peopleid=3322 (last visited Sept. 19, 2019).

[74] Zeng & Mitch, *supra* footnote 19, at 625.

[75] Zeng & Mitch, *supra* footnote 19, at 632.

[76] Zeng & Mitch, *supra* footnote 19, at 632–33.

[77] Zeng & Mitch, *supra* footnote 19, at 632–33.

[78] Sgroi, *supra* footnote 40, at 685.

[79] Sgroi, *supra* footnote 40, at 698.

85.     Despite the undeniable scientific evidence linking ranitidine to the production of high levels of NDMA, Defendants did not disclose this link to consumers on Zantac's label or through any other means.

86.     Reading this Complaint, one might ask: How did this happen? Why was this drug, which has been taken by millions, allowed to be sold? The answer is that the United States drug regulatory system is largely reliant on the drug manufacturers themselves to perform adequate testing and report adverse events.

87.     Defendants concealed the Zantac–NDMA link from consumers in part by not reporting it to the FDA, which relies on drug manufacturers (or others, such as those who submit citizen petitions) to bring new information about an approved drug like Zantac to the agency's attention.

88.     Manufacturers of an approved drug are required by regulation to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety:

> The report is required to contain . . . [a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.[80]

89.     The manufacturer's annual report also must contain "[c]opies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in

---

[80] 21 C.F.R. § 314.81(b)(2).

vitro studies (e.g., mutageniticity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product."[81]

90.    Defendants simply ignored these regulations and, disregarding the scientific evidence available to them, did not report to the FDA significant new information affecting the safety or labeling of Zantac.

91.    Defendants never provided the relevant studies to the FDA, nor did they present to the FDA with a proposed disclosure noting the link between ranitidine and NDMA.

## V.    CLASS ACTION ALLEGATIONS

92.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of themselves and all other similarly situated.

93.    Subject to confirmation, clarification, or modification based on discovery to be conducted in this action, the Classes that Plaintiffs seek to represent are defined as follows:

> **The Nationwide Class under Connecticut law:** All persons who purchased over-the-counter Zantac in the United States for personal, family, or household use during the Class Period.
>
> **The Connecticut Sub-Class.** All persons who purchased over-the-counter Zantac in Connecticut for personal, family, or household use during the Class Period.
>
> **The Florida Sub-Class:** All persons who purchased over-the-counter Zantac in Florida for personal, family, or household use during the Class Period.

94.    For purposes of this action, the Class Period is defined as the period from January 1, 2010 through the present.

---

[81] 21 C.F.R. § 314.81(b)(2)(v).

95.     Excluded from the Class are each Defendant and any entity in which a Defendant has a controlling interest, as well as any Defendant's legal representatives, officers, directors, assignees, and successors.

96.     Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. During the Class Period, over-the-counter Zantac was one of the best-selling antacid medications in the United States. Hundreds of thousands—if not millions—of persons purchased the drug. Class members are readily identifiable from information and records in the possession of Defendants and third-party pharmacies such as CVS, Walgreens, Walmart, and Rite Aid.

97.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all Class members were damaged by the same wrongful conduct of Defendants: As a result of Defendants' failing to disclose that Zantac exposed users to unsafe levels of the carcinogen NDMA, Plaintiffs and Class members were misled into purchasing Zantac—a drug they otherwise would not have purchased. There are numerous Zantac substitutes; in addition to other H2 blockers such as Pepcid-AC and Tagamet-HB, there are also proton pump inhibitors—for example, Dexilant, Nexium, Prevacid, Protonix, AcipHex, and Prilosec—which "block the enzyme in the stomach wall that makes acid."[82]

98.     Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the other members of the Class.

---

[82] *How Acid Reducers Can Help Treat Heartburn*, WEBMD (June 10, 2017), https://www.webmd.com/heartburn-gerd/h2-blockers-how-acid-reducers-can-help-treat-gerd-symptoms.

99.    Plaintiffs' lead counsel are experienced in the prosecution of class-action litigation and have particular experience with class-action litigation involving pharmaceutical products.

100.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful actions.

101.    Questions of law and fact common to the Class include, but are not limited to:

a.  Whether the Zantac sold by Defendants exposed Plaintiffs and Class members to unsafe levels of the carcinogen NDMA;

b.  Whether Defendants knew or had reason to know that Zantac exposes users to unsafe quantities of NDMA;

c.  Whether Defendants acted to conceal from consumers that Zantac exposes users to unsafe quantities of NDMA;

d.  Whether Defendants' conduct was knowing or willful;

e.  Whether Defendants notified the FDA that Zantac exposes users to unsafe quantities of NDMA;

f.  Whether Defendants attempted to gain approval from the FDA to change Zantac's label to add a warning that the drug exposes users to unsafe quantities of NDMA;

g.  Whether Defendants acted to conceal from the FDA the link between Zantac and NDMA;

h.  Whether Defendants' failure to disclose on Zantac's label (or elsewhere) that the drug produces high levels of the carcinogen NDMA was unfair, deceptive, fraudulent, or unconscionable;

i.  Whether Defendants are liable to Plaintiffs and Class members for damages under state consumer-protection statutes;

j.  When Defendants manufactured and sold Zantac in the United States;

k.   Whether an injunction should be issued requiring Sanofi Defendants to disclose on Zantac labels that the drug exposes users to unsafe levels of NDMA; and

l.   Whether Plaintiffs and Class members are entitled to attorneys' fees, prejudgment interest, and costs, and if so, in what amount.

102.   Plaintiffs and Class members have all suffered harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism—including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually—substantially outweigh potential difficulties in management of this class action. Absent a class action, most members of the Class would find the cost of litigating their claims to be prohibitive and will have no effective remedy at law. The class treatment of common questions of law and fact also is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. Additionally, Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Class and require court imposition of uniform relief to ensure compatible standards of conduct toward the Class, thereby making appropriate equitable relief to the Class as a whole within the meaning of Rules 23(b)(1) and (b)(2).

103.   Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

**A.  Discovery-Rule Tolling**

104.    Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered through the exercise of reasonable diligence that Defendants were not disclosing the high levels of the carcinogen NDMA produced by Zantac.

105.    Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendants did not disclose the high levels of NDMA produced by Zantac. The information linking Zantac to NDMA was contained exclusively in articles that were published in scientific journals. Plaintiffs and Class members did not have access to these scientific articles because they were behind a paywall. And even had the articles been more widely available, the significance of these highly technical articles would not have been apparent to Plaintiffs or Class members.

106.    Plaintiffs and Class members could not have reasonably discovered the true extent of Defendants' deception with regard to Zantac's safety until Valisure filed its citizen petition disclosing the extremely high levels of NDMA produced by Zantac.

107.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule.

**B.  Fraudulent-Concealment Tolling**

108.    All applicable statutes of limitation have also been tolled by Defendants' fraudulent concealment throughout the period relevant to this action of Zantac's producing high levels of the carcinogen NDMA.

109.     Instead of disclosing to consumers the link between Zantac and the carcinogen NDMA, Defendants continued to manufacture and sell Zantac without disclosing this information on the drug's label or elsewhere.

**C.  Estoppel**

110.     Defendants were under a continuous duty to disclose to Plaintiffs and the other Class members the risk of NDMA exposure associated with Zantac.

111.     Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true risks of NDMA exposure associated with Zantac and never updated the drug's label to disclose this risk.

112.     Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLAIMS FOR RELIEF

## CLAIMS BROUGHT BY CONNECTICUT PLAINTIFFS ON BEHALF OF THEMSELVES, THE NATIONWIDE CLASS, AND THE CONNECTICUT CLASS

### COUNT 1: VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT (CONN. GEN. STAT. §§ 42-110A TO -110Q), CLAIM BY CONNECTICUT PLAINTIFFS AGAINST ALL DEFENDANTS

113.     Plaintiffs Jonathan Dimesky and Mohamed Haridi ("Plaintiffs" for purposes of all claims under Connecticut law) hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

114.     This claim is brought by Plaintiffs against all Defendants on behalf of the Nationwide Class and the Connecticut Class (collectively "the Class" for purposes of all claims under Connecticut law).

115.    The Connecticut Unfair Trade Practices Act provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

116.    Each Defendant is a "person" within the meaning of the Connecticut Unfair Trade Practices Act.[83]

117.    Defendants' challenged conduct occurred in "trade" or "commerce" within the meaning of the Act.[84]

118.    As alleged in this Complaint, Defendants' failure to disclose—by labeling or otherwise—the NDMA risk presented by Zantac constitutes both "unfair" and "deceptive" acts or practices in violation of the Unfair Trade Practices Act.

119.    Defendants misrepresented and omitted material facts regarding Zantac—specifically regarding its exposing consumers to NDMA—with an intent to mislead Plaintiffs and Class members.

120.    Plaintiffs and Class members had no way of knowing Defendants' representations regarding Zantac were false, misleading, and incomplete.

121.    As alleged herein, Defendants engaged in a pattern of deception and public silence in the face of their knowledge of a defect with Zantac. Plaintiffs and Class members did not, and could not, unravel Defendants' deception on their own.

122.    Defendants knew or should have known that their conduct violated the Connecticut Unfair Trade Practices Act.

---

[83] Conn. Gen. Stat. § 42-110a(3).

[84] *Id.* § 42-110a(4).

123.    Defendants had a duty to disclose the truth about the NDMA levels produced by Zantac because this defect in the drug creates a risk to consumers' health, and Plaintiffs and Class members relied on Defendants' material misrepresentations and omissions regarding the safety of Zantac.

124.    Defendants' conduct proximately caused injury to Plaintiffs and Class members who purchased over-the-counter Zantac.

125.    Plaintiffs and Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damages as a proximate result of Defendants' conduct in that Plaintiffs would not have purchased Zantac had they known that the drug exposed them to high levels of NDMA.

126.    Defendants' unlawful acts and practices complained of herein affect the public interest.

127.    The facts concealed and omitted by Defendants from Plaintiffs and Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase over-the-counter Zantac. Had Plaintiffs and the other Class members known about the defective nature of Zantac, they would not have purchased Zantac and instead would have purchased one of many available substitute medications.

128.    The defendants acted with reckless indifference to another's rights or wanton or intentional violation of another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights and safety of others. Therefore, punitive damages are warranted.

129.     Plaintiffs and Class members seek actual damages, punitive damages, and

attorneys' fees, and any other legal or equitable relief that the Court deems just and proper.

### COUNT 2: FRAUDULENT CONCEALMENT (UNDER CONNECTICUT COMMON LAW), CLAIM BY CONNECTICUT PLAINTIFFS AGAINST ALL DEFENDANTS

130.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth

herein.

131.     Plaintiffs bring this claim against all Defendants on behalf of the Nationwide Class

and the Connecticut Class.

132.     Defendants intentionally concealed that Zantac is defective and unsafe because it

exposes consumers to high levels of NDMA.

133.     Defendants affirmatively misrepresented to Plaintiffs and Class members in

advertising and other forms of communication, including standard and uniform material

provided with the drug's packaging, that Zantac had no significant defects and was safe to

consume.

134.     Defendants knew about the defect in Zantac when they made these

representations.

135.     Defendants had a duty to disclose that Zantac contains a fundamental defect as

alleged herein, because the defect created a risk to consumers' health and Plaintiffs and Class

members relied on Defendants' material representations.

136.     At all relevant times, Defendants held out Zantac to be free from defects and to be

a "safe" drug for consumers. Defendants touted the many benefits and advantages of Zantac, but

failed to disclose important facts related to the defect. This made Defendants' other statements

about Zantac deceptive.

137.    Plaintiffs and Class members did not know of the defect in Zantac, and Defendants actively concealed the defect from them.

138.    Plaintiffs and Class members reasonably relied upon Defendants' deception. They had no way of knowing that Defendants' representations were false, misleading, or incomplete. As consumers, Plaintiffs and Class members did not, and could not, unravel Defendants' deception on their own. Rather, Defendants intended to deceive Plaintiffs and Class members by concealing the true facts about Zantac exposing consumers to high levels of the carcinogen NDMA.

139.    Defendants' false representations and omissions were material to consumers because they concerned a quality of Zantac—safety—that played a significant role in the value of Zantac to consumers.

140.    Defendants had a duty to disclose the Zantac defect because Defendants knew that the defect was not known to or reasonably discoverable by Plaintiffs or Class members.

141.    Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed or suppressed facts, in that they would not have purchased Zantac and would have taken other affirmative steps in light of the information concealed from them.

142.    Because of Defendants' concealment and suppression of facts, Plaintiffs and Class members sustained damage because they would not have purchased or consumed Zantac but for Defendants' actions.

143.    Plaintiffs and Class members seek damages, attorneys' fees, court costs, and any other legal or equitable relief that the Court deems just and appropriate.

144.     Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights, in order to enrich themselves. Plaintiffs and Class members request an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## CLAIMS BROUGHT BY FLORIDA PLAINTIFFS ON BEHALF OF THEMSELVES AND THE FLORIDA CLASS

### COUNT 3: VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR PRACTICES ACT (FLA. STAT. §§ 501.201–213), CLAIM BY FLORIDA PLAINTIFFS AGAINST BOEHRINGER

145.     Plaintiffs Michael Burke, Stephanie Frasier, and Richard Harris ("Plaintiffs" for purposes of all Florida claims) incorporate by reference all paragraphs as though fully set forth herein.

146.     The Florida Plaintiffs bring this claim against Boehringer on behalf of themselves and the Florida Class ("the Class" for purposes of all Florida claims).

147.     Plaintiffs and members of the Class are "consumers" under the Florida Deceptive and Unfair Trade Practices Act.[85]

148.     Boehringer engaged in "trade or commerce" as defined by the Act.[86]

149.     Section 501.204(1) of the Florida Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Boehringer participated in unfair and deceptive trade practices that violated the Act.

---

[85] Fla. Stat. Ann. § 501.203(7).

[86] *Id.* § 501.203(8).

150. By not disclosing the defective nature of Zantac, Boehringer willfully and knowingly engaged in unfair and deceptive acts in the conduct of trade and commerce within the State of Florida.

151. In purchasing Zantac, Plaintiffs and Class members were deceived by Boehringer's failure to disclose that Zantac was defective because it exposed users to high levels of the carcinogen NDMA.

152. Plaintiffs and Class members reasonably relied upon Boehringer's false misrepresentations and omissions. They had no way of knowing that Boehringer's representations were false, misleading, and incomplete. Boehringer willfully and knowingly engaged in a pattern of deception and public silence in the face of a known defect with Zantac. Plaintiffs and Class members did not, and could not have, unravel Boehringer's deception on their own.

153. Boehringer's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

154. Boehringer willfully and knowingly misrepresented material facts regarding Zantac with intent to mislead Plaintiffs and Class members.

155. Boehringer knew or should have known that their conduct violated the Florida Deceptive and Unfair Practices Act.

156. Boehringer owed Plaintiffs and Class members a duty to disclose the truth about the defect in Zantac because that defect presented a harm to consumer health, and Plaintiffs and Class members relied on Boehringer's material misrepresentations and omissions regarding the drug's safety.

157.    Plaintiffs and Class members were injured and suffered ascertainable loss, injury-in-fact, and actual damages as a proximate result of Boehringer's conduct because Plaintiffs and Class members bought a drug—Zantac—that they would not have purchased but for Boehringer's material misrepresentations and omissions.

158.    Boehringer's violations of the Act cause continuing injuries to Plaintiffs and Class members. Boehringer's unlawful acts and practices complained of herein affect the public interest.

159.    Plaintiffs and Class members seek damages and treble damages for Boehringer's knowing violations.

160.    Plaintiffs and Class members also seek court costs and attorneys' fees.

### COUNT 4: FRAUDULENT CONCEALMENT (UNDER FLORIDA COMMON LAW), CLAIM BY FLORIDA PLAINTIFFS AGAINST BOEHRINGER

161.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

162.    The Florida Plaintiffs bring this claim against Boehringer on behalf of themselves and the Florida Class.

163.    Boehringer intentionally concealed that Zantac is defective and unsafe because it exposes consumers to high levels of NDMA.

164.    Boehringer affirmatively misrepresented to Plaintiffs and Class members in advertising and other forms of communication, including standard and uniform material provided with the drug's packaging, that Zantac had no significant defects and was safe to consume.

165.    Boehringer knew about the defect in Zantac when they made these representations.

166.    Boehringer had a duty to disclose that Zantac contains a fundamental defect as alleged herein, because the defect created a risk to consumers' health, and Plaintiffs and Class members relied on Boehringer's material representations.

167.    At all relevant times, Boehringer held out Zantac to be free from defects and to be a "safe" drug for consumers. Boehringer touted the many benefits and advantages of Zantac, but failed to disclose important facts related to the defect. This made Boehringer's other statements about Zantac deceptive.

168.    Plaintiffs and Class members did not know of the defect in Zantac, and Boehringer actively concealed the defect from them.

169.    Plaintiffs and Class members reasonably relied upon Boehringer's deception. They had no way of knowing that Boehringer's representations were false, misleading, or incomplete. As consumers, Plaintiffs and Class members did not, and could not, unravel Boehringer's deception on their own. Rather, Boehringer intended to deceive Plaintiffs and Class members by concealing the true facts about Zantac exposing consumers to high levels of the carcinogen NDMA.

170.    Boehringer's false representations and omissions were material to consumers because they concerned a quality of Zantac—safety—that played a significant role in the value of Zantac to consumers.

171.    Boehringer had a duty to disclose the Zantac defect because they knew that the defect was not known to or reasonably discoverable by Plaintiffs or Class members.

172.    Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed

or suppressed facts, in that they would not have purchased Zantac and would have taken other affirmative steps in light of the information concealed from them.

173.    Because of Boehringer's concealment and suppression of facts, Plaintiffs and Class members sustained damage because they would not have purchased or consumed Zantac but for Boehringer's actions.

174.    Plaintiffs and Class members seek damages, attorneys' fees, court costs, and any other legal or equitable relief that the Court deems just and appropriate.

175.    Boehringer's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights, and in order to enrich Boehringer. Plaintiffs and Class members seek an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request on behalf of themselves and members of the Class that the Court enter an order or judgment against Defendants, including the following:

A.    A determination that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure Rule 23 and for an order certifying this case as a class action and appointing Plaintiffs as Class representatives as reflected above;

B.    A declaration that Defendants' failure to disclose to consumers that Zantac produces unsafe levels of NDMA was unfair, deceptive, fraudulent, wrongful, and unlawful;

C.    Restitution for all purchases of Zantac by Plaintiffs and the Class, in an amount to be determined at trial;

D.    Disgorgement of the ill-gotten gains derived by Defendants from their misconduct;

E.    Actual damages;

F.    Statutory damages;

G.    Punitive damages;

H.   Treble damages;

I.   Compensatory damages caused by Defendants' unfair or deceptive practices; along with exemplary damages to Plaintiffs and each Class member for each violation;

J.   A permanent injunction requiring Sanofi to either (i) cease selling Zantac or (ii) add a label to their Zantac packaging warning consumers of the high levels of NDMA they will be exposed to by taking the drug;

K.   Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

L.   An order awarding Plaintiffs and the Class their attorney's fees, costs, and expenses incurred in connection with this action; and

M.   Such other and further relief as the Court deems just and proper.

## IX.   JURY DEMAND

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: September 26, 2019

Respectfully submitted,

By:  /s/ Craig A. Raabe 

Craig A. Raabe
IZARD, KINDALL & RAABE LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
craabe@ikrlaw.com

Steve W. Berman (*pro hac vice to be filed*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Jason A. Zweig (*pro hac vice to be filed*)
Zoran Tasić (*pro hac vice to be filed*)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
jasonz@hbsslaw.com
zorant@hbsslaw.com

*Attorneys for Plaintiffs and Proposed Class*